**SQUITIERI & FEARON, LLP**
Olimpio Lee Squitieri (*pro hac vice* forthcoming)
205 Hudson Street, 7th Floor
New York, New York 10013
Telephone: 212-421-6492
lee@sfclasslaw.com

**MOORE LAW, PLLC**
Fletcher Moore (*pro hac vice* forthcoming)
30 Wall Street, 8th Floor
New York, New York 10005
Telephone: (212) 709-8245
fletcher@fmoorelaw.com

**THE DIULIO FIRM PC**
Kristopher P. Diulio (Bar No. 229399)
KDiulio@DiulioFirm.com
3330 Harbor Blvd., Suite 334
Costa Mesa, California 92626
Telephone: 714-450-6830

Attorneys for Plaintiff
KEN BECKER

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KEN BECKER, Derivatively on Behalf of ROBLOX CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>DAVID BASZUCKI, GREGORY BASZUCKI, CHRISTOPHER CARVALHO, ANTHONY P. LEE, GINA MASTANTUONO, ANDREA WONG, JASON KILAR, NAVEEN K. CHOPRA, and MICHAEL GUTHRIE,<br><br>Defendants.<br><br>and,<br><br>ROBLOX CORPORATION,<br><br>Nominal Defendant. | CASE NO.<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR:**<br><br>1. **VIOLATONS OF SECTION 14(a) OF THE EXCHANGE ACT**<br>2. **VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**<br>3. **BREACH OF FIDUCIARY DUTY**<br>4. **UNJUST ENRICHMENT**<br>5. **UNJUST ENRICHMENT**<br><br>**DEMAND FOR JURY TRIAL** |

1. Plaintiff Ken Becker, by his attorneys, submits this Verified Stockholder Derivative Complaint asserting claims of, among others unexculpated, breach of fiduciary duty, unjust enrichment and disgorgement of profits from misappropriation of confidential information. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filing with the United States Securities and Exchange Commission ("SEC") a review of news reports, press releases, other publicly available sources and the various lawsuits, investigations, and legal proceedings into Roblox Corporation ("Roblox") by the States of Louisiana, Nevada, Florida and Texas.

## I. NATURE OF THE ACTION

2. This shareholder derivative action is brought on behalf of Roblox against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least October 31, 2024, and April 30, 2026, inclusive (the "Relevant Period"), and for violations of the federal securities laws caused by the issuance of materially false and misleading statements issued, or caused to be issued, by the Individual Defendants in the Company's SEC filings and other public statements.

3. Roblox is a technology company that provides an internet video game platform for users to create, share, and play games. Within the platform, there is a virtual economy where users can buy, sell, and trade virtual items using a digital currency called Robux. Roblox generates revenue through the sale of Roblox, which users can purchase with real money. The Company then splits its proceeds earned from the sale of Robux with those who develop games on the platform.

4. Roblox for years touted itself as "the world's safest and most family-friendly online gaming platform for kids," representing to investors, parents, and regulators that its safety and civility policies were "purpose-built to be strict," that it maintained a "multi-layered moderation system," and that it "endeavor[ed] to promptly report any suspected child exploitation or abuse materials to the relevant authorities."

5. In truth, and as the Individual Defendants knew, compared to industry standards, Roblox's safety infrastructure was minimal and easily circumvented, exposing millions of child

users to sexual predation, grooming, and sexually explicit and violent content. Defendants knew and intended that the Company's explosive growth in daily active users and bookings could be sustained by ignoring those same unaddressed safety deficiencies.

6. On October 10, 2024, Hindenburg Research published a report, based on interviews with former Roblox employees and Hindenburg's own investigation using a simulated "under 13" account, describing Roblox as "an X-rated pedophile hellscape" and alleging that Company management had consciously declined to implement parental controls and safety mechanisms that were industry standard because doing so would depress user growth and engagement metrics were sustaining Roblox share price.

7. Rather than heed that warning, address the underlying safety deficiencies, or correct the Company's public safety representations, the Individual Defendants caused or allowed Roblox to continue making materially false and misleading statements about its safety practices for more than a year, across multiple earnings calls, its Form 10-K, and its annual proxy statement, while the Company faced a mounting wave of state attorney general enforcement actions (beginning with Louisiana in August 2025 and eventually involving more than ten states), more than 150 individual civil actions later consolidated into *In re: Roblox Corporation Child Sexual Exploitation and Assault Litigation*, MDL No. 3166 (N.D. Cal.), and a formal inquiry opened by the Netherlands Authority for Consumers and Markets.

8. Only under mounting legal and regulatory pressure did Roblox begin rolling out facial age-estimation and enhanced age-verification technology, first announced on October 30, 2025. Even then, defendants Baszucki and Chopra represented to investors on the February 5, 2026 earnings call that the rollout would not meaningfully affect the Company's growth trajectory and that Roblox continued to expect 22% to 26% bookings growth for 2026. Less than three months later, on April 30, 2026, Roblox disclosed that daily active user growth had already been cut in half following the global rollout of age verification, that nearly half of the Company's daily active users had not completed the age check and thus were locked out of chat functionality, and that the Company was slashing its 2026 bookings guidance by roughly $1 billion, from a range of $8.55–$8.8 billion to a range of $7.33–$7.6 billion.

9. In response to the Company's serial corrective disclosures between October 30, 2025 and April 30, 2026, Roblox's stock price collapsed, falling from a Relevant Period high above $130 per share to $45.13 per share, erasing billions of dollars in market capitalization and exposing the Company to the Securities Class Actions, the AG enforcement actions, the MDL, and the EU inquiry described above.

10. Roblox's Board of Directors (the "Board") publicly represents to stockholders that safety and civility are "foundational" to the Company and that the Board and its Audit and Compliance Committee exercise oversight of the Company's enterprise risks, including trust and safety risk. Despite that stated oversight function, and despite the Individual Defendants' actual or constructive knowledge of Roblox's safety failures, the Individual Defendants failed to implement or monitor any reasonable system of internal controls reasonably designed to detect and address the child-safety failures described herein, and failed to correct the Company's materially false and misleading public statements concerning those failures, in breach of their fiduciary duties of loyalty, good faith, and oversight.

11. While the Company and its shareholders suffered these losses, D. Baszucki's sold millions of shares of Roblox stock during the Relevant Period—the majority of which took place when Roblox's stock was trading at a Class Period high of over $100 per share—for profits of over $400 million. Baszucki's sales were highly suspicious in both timing and amount. For example, on May 5, 2025, just three months prior to the first lawsuit filed against Roblox by the Attorney General of the State of Louisiana, Baszucki sold nearly 2 million shares of Roblox stock in a single day for proceeds of approximately $140 million.

12. Just like his brother, Defendant G. Baszucki personally sold over a million shares of Roblox common stock during the relevant period for proceeds of approximately $93,854,604.00, including a single-day sale of 973,875 shares for approximately $70 million on May 5, 2025, just months before the first state attorney general lawsuit was filed.

13. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duty, Roblox has suffered, and will continue to suffer, substantial damages, including but not limited to: (a) amounts the Company will pay to defend, settle, or satisfy judgments in the Securities Class

Action, the AG enforcement actions, the MDL, and related litigation; (b) costs associated with responding to the EU and other regulatory inquiries; (c) the loss of user growth, bookings, and goodwill resulting from the belated and disruptive rollout of age-verification technology; (d) compensation paid to the Individual Defendants who breached their fiduciary duties; and (e) costs incurred investigating and pursuing the wrongdoing alleged herein.

14. On June 8, 2026, a securities class action captioned *Mukherjee v. Roblox Corp. et al.*, case number 4:26-cv-05489 was filed against Roblox, and on July 13, 2026 another substantially similar securities class action captioned *Police & Fire Retirement System of the City of Detroit v. Roblox Corp. et al.*, case number 3:26-cv-07160 was filed against Roblox and certain of its executive officers, exposing the Company to massive class-wide liability.

## II. JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act U.S.C. § 78n(a)(l) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

16. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a). This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17. Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Roblox maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Roblox, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III. PARTIES

### A. Plaintiff

18. Plaintiff KEN BECKER is a stockholder of Roblox. Plaintiff has continuously held Roblox common stock at all relevant times and will continue to hold it through the end of this

litigation.

**B. Nominal Defendant**

19. Nominal defendant Roblox is an online gaming and gaming development platform which allows users to play, create, and monetize millions of user-generated 3D games "experiences," boasting well over 100 million daily active users during the Relevant Period. Roblox is a Nevada corporation headquartered in San Mateo, California. Roblox first went public via a direct listing on the New York Stock Exchange ("NYSE") in March 2021 under the ticker symbol RBLX. It reincorporated in Nevada from Delaware in or about late May 2025.

**C. Individual Defendants**

20. Defendant David Baszucki ("Baszucki" or "D. Baszucki") is Roblox's founder and has served as the Chief Executive Officer ("CEO") of Roblox since the Company's founding in 2004. As set forth herein, Baszucki made false and misleading statements to investors during the Relevant Period and realized profits of approximately $333,848,786 million from selling shares of Roblox common stock. Baszucki maintains over 58% voting power over the Company.

21. Baszucki was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Baszucki had access to material non-public information about Roblox, and he knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading, and/or incomplete. Baszucki was responsible for the accuracy of Roblox's corporate statements during the Relevant Period and is therefore responsible and liable for the representations contained therein or omitted therefrom.

22. Defendant Naveen Chopra ("Chopra") has been the Chief Financial Officer ("CFO") of Roblox since June 30, 2025. As set forth herein, Chopra made false and misleading statements to investors during the Relevant Period.

23. Chopra was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to

prevent their issuance or cause them to be corrected. Chopra thus knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to and were being concealed from the public. Chopra was responsible for the accuracy of Roblox's corporate statements beginning on June 30, 2025, and is therefore responsible and liable for the representations contained therein or omitted therefrom.

24. Defendant Michael Guthrie ("Guthrie") was the Chief Financial Officer ("CFO") of Roblox from February 2018 until June 30, 2025. As set forth herein, Guthrie made false and misleading statements to investors during the Relevant Period.

25. Guthrie was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Guthrie thus knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading, and/or incomplete. Guthrie was responsible for the accuracy of Roblox's corporate statements until his resignation on June 30, 2025, and is therefore responsible and liable for the representations contained therein or omitted therefrom.

26. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

27. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Relevant Period.

28. Defendant Gregory Basczucki ("G. Basczuck") has been a director of Roblox since February 2008, and is the brother of D. Baszucki.

29. Defendant Christopher Carvalho has been a director of Roblox since December 2015.

30. Defendant Jason Kilar has been a member of Roblox Board since September 2023.

31. Defendant Anthony P. Lee has been a member of the board since February 2008.

32. Defendant Gina Mastantuono has been a member of the Board since April 2021. She is the CFO of Service Now Inc., a vendor to whom Roblox paid $720,000 from January 1, 2024 to August 2025. From January 1, 2025 to December 31, 2025, Roblox paid Service Now $720,000. In 2023, Roblox paid Service Now $775,000.

33. Defendant Andrea Wong has been a member of Roblox's board since August 2020.

34. Defendants G. Baszucki, D. Baszucki, Carvalho, Kilar, Lee, Mastantuono and Wong are sometimes referred to herein as the "Demand Board Members."

35. Defendants G. Baszucki, D. Baszucki, Guthrie, Carvalho, Kilar, Lee, Mastantuono and Wong are sometimes referred to herein as the "Individual Defendants."

36. Defendants Carvalho, Kilar and Mastantuono are members of Roblox's Audit Committee and were members of that committee during the entire relevant period.

37. Defendants Lee, Guthrie, D. Baszucki, G. Baszucki, Carvalho and Wong are sometimes referred to herein as the "Insider Trading Defendants."

38. Defendants Lee, Guthrie, D. Baszucki, G. Baszucki, and Carvalho are sometimes referred to herein as the "Brophy Insider Trading Defendants."

## IV. DUTIES OF THE INDIVIDUAL DEFENDANTS

39. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Roblox and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Roblox in a fair, just, host, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Roblox and not in furtherance of their personal interest or benefit.

40. To discharge their duties, the officers and directors of Roblox were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls

of the financial affairs of the Company. By virtue of such duties, the officers and directors of Roblox were required to, among other things:

a. conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

b. refrain from using the Company's nonpublic information to their own advantage; and

c. remain informed as to how Roblox conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**A. Breaches of Duties**

41. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Roblox, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

42. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Roblox, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, Roblox has expended, and will continue to expend, significant sums of money.

**B. Additional Duties of the Audit Committee Defendants**

43. The Audit and Compliance Committee Charter provides that the Audit and Compliance Committee are to monitor and advise the Board on, *inter alia*: (i) the accounting and

financial reporting processes and internal controls of the Company; (ii) the audit and integrity of the Company's financial statements; (iii) the Company's compliance with applicable law (including U.S. federal securities laws and other legal an regulatory requirements); (iv) the qualifications, independence and performance of the Company's independent auditors; and (v) the implementation and performance of the Company's internal audit function, if applicable.

44. The Audit and Compliance Committee Charter also sets forth these specific duties, in relevant part:

> [] Review of Internal Controls and Integrity of Financial Statements. The Committee shall meet with management, the internal audit department, if applicable, and the Company's independent auditor to review and discuss the Company's internal controls and the integrity of the Company's audited financial statements. Included in this process shall be review of:
>
> a. the scope and timing of the annual audit of the Company's financial statements;
>
> b. the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and Form 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations"; the Committee shall make a recommendation to the Board as to whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K for filing with the SEC;
>
> c. the results of the independent audit and the quarterly reviews, and the independent auditor's opinion on the audited financial statements;
>
> d. discussion with management and the independent auditor with regard to any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's internal controls;
>
> e. the Company's disclosure controls and procedures, as well as the quarterly assessments of such controls and procedures by the Chief Executive Officer and Chief Financial Officer;
>
> f. any major issues regarding accounting principles and financial statement

presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

g. any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

h. the effect of regulatory and accounting initiatives, as well as off balance sheet structures, on the financial statements of the Company; and

i. any audit problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management.

## V. ROBLOX INSIDER TRADING POLICY

45. ROBLOX has an INSIDER TRADING POLICY which was adopted on November 1, 2020; Amended on May 26, 2021 and March 15, 2023.

46. The Insider Trading Policy provides in pertinent part:

**B. POLICY STATEMENT**

1. No Trading on Material Nonpublic Information. It is illegal for anyone to buy, sell or otherwise trade in securities on the basis of material nonpublic information. If you are in possession of material nonpublic information about the Company, you are prohibited from:

a. using it to transact in securities of the Company (which includes, buying, selling and any hedging activities);

b. disclosing it to other directors, officers, employees, consultants, contractors, agents or other service providers whose roles do not require them to have the information;

c. disclosing it to anyone outside of the Company, including family, friends,

business associates, investors or consulting firms, without prior written authorization from the Compliance Officer; or

d. using it to express an opinion or make a recommendation about trading in the Company's securities.

In addition, material nonpublic information about another company that you learn through your job at the Company is subject to these same restrictions around disclosure and trading. If you are in possession of material nonpublic information about the Company's creators, developers, users, suppliers, partners or competitors, you cannot use that information to trade securities. Any such action will be deemed a violation of this Policy.

**K. VIOLATIONS OF THIS POLICY**

Company directors, officers, employees, consultants, advisors, contractors, agents and other service providers who violate this Policy will be subject to disciplinary action by the Company, including ineligibility for future Company equity or incentive programs or termination of employment or an ongoing relationship with the Company. The Company has full discretion to determine whether this Policy has been violated based on the information available.

There are also serious legal consequences for individuals who violate insider trading laws, including large criminal and civil fines, significant imprisonment terms and disgorgement of any profits gained or losses avoided. You may also be liable for improper securities trading by any person (commonly referred to as a "tippee") to whom you have disclosed material nonpublic information that you have learned through your position at the Company or made recommendations or expressed opinions about securities trading on the basis of such information.

Please consult with your personal legal and financial advisors as needed. Note that the Company's legal counsel, both internal and external, represent the Company and not you personally. There may be instances where you suffer financial harm or other hardship or are otherwise required to forego a planned transaction because of the restrictions imposed by this Policy or under securities laws. If you were aware of the material nonpublic information at

the time of the trade, it is not a defense that you did not "use" the information for the trade. Personal financial emergency or other personal circumstances are not mitigating factors under securities laws and will not excuse your failure to comply with this Policy. In addition, a blackout or trading-restricted period will not extend the term of your options. As a consequence, you may be prevented from exercising your options by this Policy or as a result of a blackout or other restriction on your trading, and as a result your options may expire by their term. It is your responsibility to manage your economic interests and to consider potential trading restrictions when determining whether to exercise your options. In such instances, the Company cannot extend the term of your options and has no obligation or liability to replace the economic value or lost benefit to you.

47. The Exhibit A to the Insider Trading Policy lists the requirements for trading plans. It states in pertinent part:

**EXHIBIT A**

**REQUIREMENTS FOR TRADING PLANS**

For transactions under a trading plan to be exempt from (A) the prohibitions in the Company's Insider Trading Policy (the "Policy") of Roblox Corporation (together with any subsidiaries, collectively the "Company") with respect to transactions made while aware of material nonpublic information and (B) the pre-clearance procedures and blackout periods established under the Policy, the trading plan must comply with the affirmative defense set forth in Exchange Act Rule 10b5-1 and must meet the following requirements:

1. The trading plan must be in writing and signed by the person adopting the trading plan.

2. The trading plan must include representations that, on the date of adoption of the trading plan, the person adopting the trading plan:

   a. is not aware of material nonpublic information; and

   b. is adopting the trading plan in good faith and not as part of a plan or scheme to evade the prohibitions of Rule 10b5-1.

3. The trading plan must be adopted at a time when:

a. the person adopting the trading plan is not aware of any material nonpublic information; and

b. there is no quarterly, special or other trading blackout in effect with respect to the person adopting the plan.

4. The trading plan must be entered into and operated in good faith and not as part of a plan or scheme to evade the prohibitions of Rule 10b5-1 and the person adopting the trading plan must act in good faith with respect to the trading plan.

5. Hedging or similar transactions in Company securities are not permitted under the Policy. The person adopting the trading plan may not have entered into or altered a corresponding or hedging transaction or position with respect to the securities subject to the trading plan and must agree not to enter into any such transaction while the trading plan is in effect.

6. The first trade under the trading plan may not occur until the expiration of a cooling-off period consisting of the later of (a) 90 calendar days after the adoption of the trading plan and (b) two business days after the filing by the Company of its financial results in a Form 10-Q or Form 10-K for the completed fiscal quarter in which the trading plan was adopted (but, in any event, this required cooling-off period is subject to a maximum of 120 days after adoption of the trading plan).

7. The trading plan must have a minimum term of one year (starting from the date of adoption of the trading plan).

8. All transactions in Company shares during the term of the trading plan (except for the "Exceptions to Trading Restrictions" identified in the Policy and bona fide gifts) must be conducted through the trading plan. In addition, the person adopting the trading plan may not have an outstanding (and may not subsequently enter into any additional) trading plan except as permitted by Rule 10b5-1.

9. Any modification or change to the amount, price or timing of transactions under the trading plan is deemed the termination of the trading plan, and the adoption of a new trading plan ("Modification"). Therefore, a Modification is subject to the same conditions as a new

trading plan as set forth in Sections 1 through 8 herein.

## VI. INSIDER SALES BY INSIDER TRADING DEFENDANTS LEE, GUTHRIE, D. BASZUCKI, G. BASZUCKI, CARVALHO AND WONG

48. Rather than providing the market with correct information, the Insider Trading Defendants, defendants Lee, Guthrie, D. Baszucki, G. Baszucki, Carvalho and Wong used their knowledge of Roblox's misconduct, mounting lawsuits, and regulatory investigations to sell their personal holdings while the Company's stock was arterially inflated. As officers and directors of Roblox, the Insider Selling Defendants would have been privy to material nonpublic information about the Company's true business health and notices, subpoenas, demand letters or settlement agreements, including from government agencies like the first lawsuit filed against Roblox by the Attorney General of the State of Louisiana.

49. The largest stock sales during the Relevant Period by defendants D. Baszucki and G. Baszucki, both made on May 5, 2025 and collectively in excess of $200,000,000, were made four months after commencement of the Nevada Attorney General's confidential investigation, and shortly before the first publicly filed lawsuit against Roblox by the Attorney General of the State of Louisiana. These behemoth May 5, 2025 stock sales also came on the heels of an April 16, 2025 investigation and subpoena initiated by the Florida Attorney General Office.[1] These stock sales do not match previous trading practices. Despite these suspicious sales, the Company has announced or disclosed any efforts to investigate the sales or update its insider trading policy.

50. D. Baszucki sold 9,322,042 shares for proceeds of approximately $756,172,190.

| Filing Date | Trade Date | Ticker | Insider Name | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|---|---|
| 2/24/2026 16:29 | 2/20/2026 | RBLX | Baszucki David | $61.63 | -10,834 | 1,606,793 | -1% | ($667,706) |
| 2/11/2026 18:55 | 2/10/2026 | RBLX | Baszucki David | $72.66 | -272,269 | 1,617,627 | -14% | ($19,782,756) |
| 1/9/2026 16:32 | 1/7/2026 | RBLX | Baszucki David | $76.48 | -66,896 | 190,574 | -26% | ($5,116,401) |
| 12/19/2025 16:05 | 12/18/2025 | RBLX | Baszucki David | $84.73 | -66,896 | 190,574 | -26% | ($5,667,931) |

1 https://litigationconnect.com/roblox-lawsuit.com

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 11/24/2025 20:32 | 11/20/2025 | RBLX | Baszucki David | $95.24 | -10,584 | 1,175,996 | -1% | ($1,008,013) |
| 11/13/2025 20:39 | 11/11/2025 | RBLX | Baszucki David | $104.54 | -66,896 | 201,158 | -25% | ($6,992,961) |
| 8/22/2025 16:13 | 8/20/2025 | RBLX | Baszucki David | $117.72 | -10,401 | 1,276,164 | -1% | ($1,224,428) |
| 8/7/2025 18:30 | 8/5/2025 | RBLX | Baszucki David | $126.72 | -875 | 293,374 | 0% | ($110,881) |
| 8/5/2025 19:03 | 3/3/2025 | RBLX | Baszucki David | $64.94 | -14,485 | 2,676,360 | -1% | ($940,681) |
| 6/30/2025 18:01 | 6/26/2025 | RBLX | Baszucki David | $105.19 | -167,408 | 226,919 | -42% | ($17,609,698) |
| 6/26/2025 17:15 | 6/24/2025 | RBLX | Baszucki David | $105.13 | -288,654 | 226,919 | -56% | ($30,346,973) |
| 6/20/2025 16:28 | 6/17/2025 | RBLX | Baszucki David | $100.61 | -628,674 | 226,044 | -74% | ($63,249,257) |
| 6/18/2025 16:29 | 6/16/2025 | RBLX | Baszucki David | $100.50 | -321,324 | 308,763 | -51% | ($32,292,837) |
| 6/13/2025 16:26 | 6/11/2025 | RBLX | Baszucki David | $83.84 | -94,982 | 351,039 | -21% | ($7,963,135) |
| 6/9/2025 17:04 | 6/5/2025 | RBLX | Baszucki David | $94.07 | -1,817,023 | 361,956 | -83% | ($170,921,198) |
| 6/4/2025 16:43 | 6/2/2025 | RBLX | Baszucki David | $87.97 | -949,998 | 601,035 | -61% | ($83,572,221) |
| 5/22/2025 17:52 | 5/20/2025 | RBLX | Baszucki David | $80.66 | -10,424 | 1,747,734 | -1% | ($840,777) |
| 5/16/2025 16:09 | 5/13/2025 | RBLX | Baszucki David | $75.18 | -786,873 | 736,457 | -52% | ($59,157,307) |
| 5/14/2025 20:11 | 5/12/2025 | RBLX | Baszucki David | $74.44 | -163,125 | 839,991 | -16% | ($12,142,650) |
| 5/7/2025 19:36 | 5/5/2025 | RBLX | Baszucki David | $72.19 | -1,899,997 | 1,449,058 | -57% | ($137,161,289) |
| 4/9/2025 20:24 | 4/7/2025 | RBLX | Baszucki David | $52.48 | -314,098 | 1,048,953 | -23% | ($16,483,949) |
| 3/19/2025 17:28 | 3/17/2025 | RBLX | Baszucki David | $57.05 | -40,918 | 1,151,425 | -3% | ($2,334,225) |
| 3/5/2025 18:01 | 3/3/2025 | RBLX | Baszucki David | $64.94 | -248,568 | 1,051,420 | -19% | ($16,142,428) |
| 2/27/2025 21:39 | 2/25/2025 | RBLX | Baszucki David | $60.50 | -1,738 | 1,066,781 | 0% | ($105,149) |
| 2/21/2025 20:40 | 2/20/2025 | RBLX | Baszucki David | $61.33 | -6,448 | 2,764,288 | 0% | ($395,478) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2/3/2025 17:00 | 1/30/2025 | RBLX | Baszucki David | $71.64 | -330,194 | 225,835 | -59% | ($23,656,355) |
| 12/9/2024 17:35 | 12/5/2024 | RBLX | Baszucki David | $57.31 | -483,335 | 1,004,280 | -32% | ($27,698,899) |
| 11/22/2024 18:18 | 11/20/2024 | RBLX | Baszucki David | $51.43 | -6,460 | 3,077,511 | 0% | ($332,249) |
| 11/20/2024 18:50 | 11/18/2024 | RBLX | Baszucki David | $50.71 | -241,665 | 1,052,407 | -19% | ($12,254,358) |

51. G. Baszucki sold 139,6982 shares for proceeds of approximately $93,854,604.

| Filing Date | Trade Date | Ticker | Insider Name | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|---|---|
| 4/3/2026 17:08 | 4/1/2026 | RBLX | Baszucki Gregory | $57.95 | -16,666 | 3,051,680 | -1% | ($965,840) |
| 3/3/2026 16:31 | 2/27/2026 | RBLX | Baszucki Gregory | $68.98 | -16,666 | 3,060,013 | -1% | ($1,149,634) |
| 5/7/2025 19:41 | 5/5/2025 | RBLX | Baszucki Gregory | $72.11 | -973,875 | 12,107,799 | -7% | ($70,228,092) |
| 4/3/2025 19:28 | 4/1/2025 | RBLX | Baszucki Gregory | $60.45 | -97,387 | 12,399,961 | -1% | ($5,886,745) |
| 3/11/2025 19:10 | 3/10/2025 | RBLX | Baszucki Gregory | $53.55 | -97,388 | 12,429,177 | -1% | ($5,215,397) |
| 1/24/2025 17:26 | 1/22/2025 | RBLX | Baszucki Gregory | $65.89 | -26,000 | 12,460,226 | 0% | ($1,713,015) |
| 12/30/2024 16:37 | 12/26/2024 | RBLX | Baszucki Gregory | $59.70 | -26,000 | 12,486,226 | 0% | ($1,552,184) |
| 12/2/2024 19:07 | 11/27/2024 | RBLX | Baszucki Gregory | $49.75 | -26,000 | 12,512,226 | 0% | ($1,293,627) |
| 11/4/2024 18:07 | 10/31/2024 | RBLX | Baszucki Gregory | $50.00 | -117,000 | 12,604,824 | -1% | ($5,850,070) |

52. Lee sold 1,280,062 shares for proceeds of approximately $110,152,124.

| Filing Date | Trade Date | Insider Name | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|---|
| 1/14/2026 18:19 | 1/13/2026 | Lee Anthony P | $82.45 | -7,000 | 1,127,119 | -1% | ($577,150) |
| 1/5/2026 17:00 | 1/2/2026 | Lee Anthony P | $79.96 | -59,000 | 1,127,609 | -5% | ($4,717,480) |
| 12/2/2025 19:30 | 12/1/2025 | Lee Anthony P | $92.54 | -66,000 | 1,393,436 | -5% | ($6,107,823) |
| 11/5/2025 16:22 | 11/4/2025 | Lee Anthony P | $104.08 | -66,000 | 1,402,367 | -4% | ($6,868,945) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 10/2/2025 17:46 | 10/1/2025 | Lee Anthony P | $136.33 | -66,000 | 1,411,607 | -4% | ($8,997,941) |
| 9/4/2025 17:25 | 9/2/2025 | Lee Anthony P | $122.74 | -66,000 | 1,145,599 | -5% | ($8,100,944) |
| 8/5/2025 17:05 | 8/1/2025 | Lee Anthony P | $130.40 | -177,112 | 1,150,219 | -13% | ($23,095,117) |
| 7/2/2025 20:40 | 7/1/2025 | Lee Anthony P | $103.89 | -66,000 | 1,550,439 | -4% | ($6,856,782) |
| 6/3/2025 18:06 | 6/2/2025 | Lee Anthony P | $87.89 | -66,000 | 1,270,571 | -5% | ($5,800,849) |
| 5/22/2025 18:01 | 5/21/2025 | Lee Anthony P | $82.45 | -14,000 | 1,275,191 | -1% | ($1,154,355) |
| 5/16/2025 19:51 | 5/14/2025 | Lee Anthony P | $79.45 | -13,600 | 1,276,171 | -1% | ($1,080,572) |
| 5/13/2025 20:15 | 5/12/2025 | Lee Anthony P | $74.99 | -26,000 | 1,277,123 | -2% | ($1,949,679) |
| 5/8/2025 20:03 | 5/6/2025 | Lee Anthony P | $70.01 | -66,150 | 408,592 | -14% | ($4,630,964) |
| 4/3/2025 17:16 | 4/1/2025 | Lee Anthony P | $61.37 | -21,200 | 13,082,325 | 0% | ($1,300,963) |
| 1/17/2025 16:21 | 1/16/2025 | Lee Anthony P | $65.04 | -250,000 | 11,402,683 | -2% | ($16,259,275) |
| 12/3/2024 19:48 | 12/2/2024 | Lee Anthony P | $51.19 | -25,000 | 26,929,608 | 0% | ($1,279,670) |
| 11/18/2024 19:21 | 11/15/2024 | Lee Anthony P | $52.34 | -25,000 | 26,954,608 | 0% | ($1,308,435) |
| 11/1/2024 17:29 | 10/31/2024 | Lee Anthony P | $50.33 | -200,000 | 39,526,582 | -1% | ($10,065,180) |

53. Guthrie sold 533,593 shares for proceeds of approximately $33,506,411.

| Filing Date | Trade Date | Ticker | Insider Name | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|---|---|
| 6/9/2025 17:12 | 6/5/2025 | RBLX | Guthrie Michael | $91.55 | -50,000 | 553,688 | -8% | ($4,577,260) |
| 5/22/2025 17:50 | 5/20/2025 | RBLX | Guthrie Michael | $80.66 | -24,168 | 553,688 | -4% | ($1,949,319) |
| 5/14/2025 20:12 | 5/12/2025 | RBLX | Guthrie Michael | $71.77 | -50,000 | 577,856 | -8% | ($3,588,622) |
| 4/7/2025 16:37 | 4/3/2025 | RBLX | Guthrie Michael | $58.79 | -50,000 | 577,856 | -8% | ($2,939,632) |
| 3/6/2025 17:17 | 3/4/2025 | RBLX | Guthrie Michael | $60.14 | -50,000 | 456,887 | -10% | ($3,006,854) |
| 2/26/2025 21:25 | 2/24/2025 | RBLX | Guthrie Michael | $61.14 | -50,000 | 456,887 | -10% | ($3,057,039) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2/24/2025 18:05 | 2/20/2025 | RBLX | Guthrie Michael | $61.34 | -21,614 | 456,887 | -5% | ($1,325,844) |
| 2/12/2025 21:39 | 2/11/2025 | RBLX | Guthrie Michael | $65.94 | -26,154 | 478,501 | -5% | ($1,724,673) |
| 12/9/2024 17:33 | 12/5/2024 | RBLX | Guthrie Michael | $55.92 | -100,000 | 392,609 | -20% | ($5,591,778) |
| 12/4/2024 16:48 | 12/2/2024 | RBLX | Guthrie Michael | $51.36 | -40,000 | 392,609 | -9% | ($2,054,400) |
| 11/22/2024 18:23 | 11/20/2024 | RBLX | Guthrie Michael | $51.43 | -21,657 | 392,609 | -5% | ($1,113,855) |
| 11/19/2024 20:43 | 11/15/2024 | RBLX | Guthrie Michael | $52.07 | -40,000 | 414,266 | -9% | ($2,082,780) |
| 11/4/2024 18:06 | 10/31/2024 | RBLX | Guthrie Michael | $49.44 | -10,000 | 414,266 | -2% | ($494,355) |

54. Carvalho sold 116,866 shares for proceeds of approximately $10,204,101.

| Filing Date | Trade Date | Ticker | Insider Name | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|---|---|
| 6/18/2025 16:27 | 6/16/2025 | RBLX | Carvalho Christopher | $100.08 | -64,925 | 1,147,881 | -5% | ($6,497,739) |
| 6/4/2025 16:40 | 6/2/2025 | RBLX | Carvalho Christopher | $89.25 | -12,985 | 1,147,881 | -1% | ($1,158,948) |
| 5/7/2025 19:42 | 5/5/2025 | RBLX | Carvalho Christopher | $72.16 | -12,985 | 1,143,380 | -1% | ($936,981) |
| 4/3/2025 19:22 | 4/1/2025 | RBLX | Carvalho Christopher | $60.45 | -12,985 | 1,143,380 | -1% | ($784,920) |
| 3/5/2025 18:22 | 3/3/2025 | RBLX | Carvalho Christopher | $63.57 | -12,986 | 1,143,380 | -1% | ($825,513) |

55. Wong sold 6,333 shares of proceeds of approximately $789,628.

| Filing Date | Trade Date | Ticker | Insider Name | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|---|---|
| 2/26/2026 16:14 | 2/24/2026 | RBLX | Wong Andrea L | $66.16 | -563 | 45,827 | -1% | ($37,249) |
| 8/6/2025 17:22 | 8/4/2025 | RBLX | Wong Andrea L | $130.40 | -5,770 | 46,391 | -11% | ($752,379) |

## VII. DAMAGES TO ROBLOX

56. As a result of the Individual Defendants' improprieties, Roblox disseminated improper, public statements. These improper statements have devastated Roblox's credibility as reflected by the Company's over $3.2 billion, or 63%, market capitalization loss to date.

57. Roblox's issues also damaged its reputation within the business community and in the

capital markets. In addition to price, Roblox's current and potential customer base has lost al trust in Roblox's ability to maintain a safe platform. Roblox's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have creased the perceived risks of investing in and lending money to the Company.

58. Further, as a direct and proximate result of the Individual Defendants' actions, Roblox has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

a. costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws and consumer laws;

b. costs of defending state attorney general actions; and

c. costs incurred from compensation and benefits paid to the defendants who have breached their duties to Roblox.

59. In addition, the Company is entitled to recoup the benefit the Insider Selling Defendants reaped by using Roblox's nonpublic information to their own advantage.

## VIII. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

60. Plaintiff brings this action derivatively in the right and for the benefit of Roblox to redress injuries suffered, and to be suffered, by Roblox as a direct result of breach of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Roblox is named as a nominal defendant solely in a derivative capacity. This is not a collusive action jurisdiction on this Court that it would not otherwise have.

61. Plaintiff will adequately and fairly represent the interests of Roblox in enforcing and its rights.

62. Plaintiff was a stockholder of Roblox at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Roblox stockholder.

63. At the time this suit was filed, the Board was comprised of eight (8) members, the Director Defendants (as defined *supra*) along with Non-Party Dennis Durkin ("Durkin")

(collectively, the "Current Directors"). Plaintiff has not made any demand on the present board to institute this action because such a demand would be futile, wasteful, and useless act, as set forth below. In sum, D. Baszucki and G. Baszucki (his brother) are unassailably conflicted. The Insider Trading Defendant board members, Lee, G. Baszucki, Carvalho and Wong are likewise unassailably conflicted.

64. Because Defendant D. Baszucki maintains over 58% voting power over the Company, the Company is a "controlled company" under NYSE listing standard meaning that the Company need not have a majority independent Board. Not only this, but Defendant D. Baszucki maintains absolute control over the Board and the outcome of shareholder votes. Accordingly, the Current Directors could not independently consider a demand to sue Defendant D. Baszucki.

65. In 2008, D. Baszucki placed his brother, G. Baszucki, on the Roblox Board and gave G. Baszucki the second highest number of shares in the Company— second only to D. Baszucki.

66. Given the Baszuckis' familial relationship, D. Baszucki and G. Baszucki lack independence from each other, and each faces a substantial likelihood of liability for breach of fiduciary duty of loyalty by committing insider trading with the Company's stock.

67. Defendant Mastantuono is also lacks independence from D. Baszucki. According to the Company's Proxy Statement filed with the SEC on April 17, 2025, Mastantuono, serves as the President and CFO of ServiceNow, Inc. ("ServiceNow"). ServiceNow is a vendor for Roblox that received millions of dollars in revenue from Roblox since Mastantuono has joined the Board in 2021.

68. D. Baszucki as Roblox's founder, President, CEO, and controlling stockholder ("Controlling Defendant") has the power both to replace Mastantuono and not renew vendor agreements with ServiceNow, which could amount to millions of dollars in losses of revenue to ServiceNow. Therefore, Mastantuono lacks independence from D. Baszucki.

**A. Demand Is Excused Because Seven of Eight Members of the Current Board Face a Substantial Likelihood of Unexculpated Liability to Roblox**

69. Defendants breached their fiduciary duties and can be liable to Roblox under Nevada law due to, *inter alia*, their conduct in violation of laws, rules and regulations.

70. In addition, Defendants Lee, Guthrie, D. Baszucki, G. Baszucki, Carvalho and Wong all possessed material, nonpublic insider proprietary company information ("MNPI") and used that information to benefit themselves by selling their personally held Company stock, as detailed herein which was against Roblox policy and codes which defendants were obliged to follow. Accordingly, these defendants face a substantial likelihood of liability for breach of their fiduciary duty of loyalty.

71. Defendants Carvalho, Kilar, and Mastantuono, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee s Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company s earnings guidance and financial and disclosure controls. Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

## IX. SUBSTANTIVE ALLEGATIONS

72. The compensation being paid to Roblox highest seven executive officers is excessive and unearned given the revelations of Roblox's illegal practices for the last several years, nominating David Bascucki, Naveen Chopra, Michael Guthrie, Manual Bronstein, Arvind Chakravarthy, Matt Kaufman and Mark Reinstva. The compensation range for those employees for 2023, 2024 and 2025 ranged from $29,600,000 to $43,813,738.

73. Roblox was founded as a video game development company by CEO David Baszucki and co-founder Erik Cassel in 2004. Roblox is unique in that it operates as both a gaming platform and a gaming development environment. Specifically, the Company allows users to play, create, and monetize millions of user-generated 3D games or "experiences." The Roblox platform also contains a social component, which lets its users interact through a chat function.

74. Roblox is particularly popular with children. According to reports by Roblox, the

majority of its of daily active users are under the age of sixteen, and 40% are under the age of twelve. Roblox's popularity surged between 2020 and 2021, with its number of daily active users doubling during that period.

75. Given the extent of its popularity with children, Roblox frequently touted the safety of its platform, and assured investors and parents that any misuse of the platform was limited to a small number of incidents. For years, Roblox has marketed itself as the world's safest and most family-friendly online gaming platform for kids. For example, Roblox proclaims in its SEC filings that "[s]afety and civility are foundational to everything we do," and that safety is "an integral and differentiating part of our brand." The Company tells parents it "cares deeply about child safety" and takes "every precaution possible" to protect children. It likewise assures both parents and investors that, precisely "[b]ecause our Platform includes children aged 5 and over," the Company's "highest priority is to create a safe and civil online environment" and that its "safety and civility policies are purpose-built to be strict."

76. In fact the opposite was true, Roblox's child safety features were minimal and easily exploited by child predators. Roblox's content moderation efforts were also insufficient, leading many children to be exposed to illegal, violent, and sexually explicit content. Roblox was also plagued by users who registered on the platform under multiple identifiers but from the same cell number. This was easily ascertainable by Roblox, but to inflate its user metrics Roblox reported the duplicate profiles as unique users.

77. Roblox's explosive growth was therefore not fueled by organic demand for its games, but rather by its failure to implement meaningful safety features, which allowed millions of children to access the platform and, in turn, enabled rampant exploitation and targeting of those children by predators as well as counting multiple profiles from the same person as unique users.

78. For years, Roblox failed to implement basic protections for its child users, despite knowing that its platform was unsafe for children. Rather than address these known safety deficiencies, Roblox ignored them in order to keep growing its user base and revenues.

79. For example, Roblox has monetized and promoted the very interactions that have put children at risk. Its heavily marketed text and voice chat functions are the key drivers of user

engagement on its platform, and the Company has openly encouraged more adults to join the platform as part of its strategy to "age up" its user bases and increase user spending. At the same time, Roblox has taken a cut of every transaction, every experience, and every avatar upgrade that kept children engaged on the platform and, in many instances, interacting with adult predators just a little bit longer.

80. On October 10, 2024, Hindenburg Research (an investment firm), published a report detailing the prevalence of child predators, disturbing content, and incidents of child abuse on the Roblox platform, and alleged that Roblox executives were aware of these dangers and the platform's severe lack of safety infrastructure. The report cited instances of in-game grooming, sexual exploitation, and glorification of violence. Hindenburg specifically alleged that the availability of inappropriate content was the result of a conscious decision by Roblox to prioritize profits over safety, citing former employees who said Roblox chose not to implement parental controls and safety mechanisms because doing so would hurt user growth and engagement metrics.

81. Hindenburg conducted its investigation by creating an "under 13" account on Roblox from which it was able to access highly sexualized and violent content, with numerous games including older users regularly describing lewd sex acts or using hateful slurs over the platform's chat function.

82. The report stated, "[w]e found Roblox to be an X-rated pedophile hellscape, replete with users attempting to groom our avatars, violent content and extremely abusive speech—all of which is open to young children and all while Roblox has cut moderation spending to appease Wall Street and boost earnings." Hindenburg interviewed former Roblox employees for the report, who described internal efforts to implement safety measures on the platform that "didn't even get to the experiment phase and [were] disapproved" by top management because, "[y]ou can keep your players safe, but then it would be less of them on the platform"—while if you instead "just let them do what they want to do," then "the numbers all look good and investors will be happy." Hindenburg also described how Roblox had seemingly failed to take any corrective action, as it was able to independently and easily identify abusive practices and transactions in Roblox's games with minimal safety checks.

83. Roblox vehemently denied the allegations in the Hindenburg report shortly after its release in October 2024. On November 6, 2024, Roblox began its climb from $52.90 to a September 2025 high of $138.52.

84. Roblox's corporate governance documents task the Audit Committee with legal and regulatory compliance and preparation of Proxy Statements reports required by the SEC (which we have already alleged were materially misleading), review of earnings press releases, earnings guidance, and financial information provided to public, analysts and rating agencies and "Compliance with Laws."

85. Beginning with the state of Louisiana in August 2025, these lawsuits contain similar allegations to those outlined in the Hindenburg report, and collectively allege that Roblox violated various state consumer protection, child online privacy and negligence statutes by falsely claiming that the Roblox platform was safe for children, and that Roblox conducted a safety review of all uploaded image, audio, and video files, while failing to institute basic safety measures to protect children from sexual predators and sexually explicit content on its platform.

86. In addition, Roblox is also facing over 150 lawsuits filed by individuals and their families that allege that they were harmed by child predators on Roblox. These actions were centralized into a federal multidistrict litigation in this district titled, In re: Roblox Corporation Child Sexual Exploitation and Assault Litigation, MDL No. 3166, on December 13, 2025. The individual lawsuits also allege that Roblox created an environment for sexual predators to exploit children and prioritized profits and company growth over child safety.

87. Fearful of personal liability to Roblox under Delaware law, the Individual Defendants decided to reincorporate in Nevada. Roblox reincorporated in Nevada from Delaware on May 30, 2025 after shareholders approved the reincorporation by vote on May 29, 2025. At the time Roblox solicited its shareholders vote it was under investigation by the Nevada Attorney General's office ("Nev. A.G.") which commenced it investigation on or about November 1, 2024.[2]

---

2 See *State of Nevada v. Roblox Corporation*, Case No.: A-26-944136-B, Dept. No.: XXXI CONSENT JUDGMENT, Exhibit A, Page 1) (https://ag.nv.gov/uploadedFiles/agnvgov/Content/News/PR/PR_Docs/2026/2026%200415%20Roblox%20-%20CJ.pdf

88. On April 17, 2025, Roblox filed its Notice of 2025 Annual Meeting of Stockholders, for [The 2025 Proxy] soliciting votes from stockholders on five proposals among the election of Class I Directors and Proposal #4 Approval of the Reincorporation of Roblox to the State of Nevada by conversion for the May 29, 2025 meeting.

89. Two weeks after sending stockholders the 2025 Proxy, Roblox filed its Quarterly Report on Form 10-Q for the quarter ended March 31, 2025 on May 1, 2025.

90. That Q-1 10-Q revealed three insiders entered into 10b5-1 plans in the first quarter.

91. The Q-1 10-Q did not disclose any of the investigations or lawsuits.

92. In the Q-1 10-Q Roblox offered only vague, unspecified risk warnings about the risks presented to Roblox' business from federal and state regulation in the United States:

> In the U.S. we are subject to both federal and state regulation of online services accessed and used by children, as well as state and federal legislative initiatives, such as the proposed Kids Online Safety and Privacy Act and various state proposals, which have and may continue to vary significantly. For example, in 2024 the State of Texas enacted new restrictions on purchasing by minors, including requiring parental consent for minors to purchase digital items, including on our Platform. Further, in March 2025 the State of Utah enacted new restrictions on applications available via app stores, which include requiring app stores collect verifiable parental consent for minors to engage in in-app purchase, including on our Platform. The law also carries a private right of action. These additional restrictions may have an adverse impact on our revenue and bookings from users in Texas and Utah in the near term.

93. Roblox also misrepresented in the Q-1 10-Q the prevalence of dangerous content and users on its platform:

> Although illicit activities are in violation of our terms and policies, and we attempt to block objectionable material and ban bad actors from our Platform, we are unable to prevent all such violations from occurring and banned actors have, at times, been able to evade our detection systems and regain access to our Platform through alternative accounts.

We invest significant technical and human resources to prevent inappropriate content on our Platform by using a range of tools and policies, including several designed to review all images, audio, and video at the time of upload in order to block inappropriate content before users have a chance to encounter it on our Platform. Notwithstanding our efforts, from time to time, inappropriate content is successfully uploaded onto our Platform and can be viewed by others prior to being identified and removed by us. Additionally, in some of our experiences users are able to generate in-experience content which may not be detectable by our automated moderation systems.

Further, children may attempt to misrepresent their age, which could lead them to be exposed to inappropriate content or behavior by participating in experiences that are not age-appropriate or gaining access to features we have restricted to older users. While we have introduced Content Maturity Labels that enable users to make informed decisions about the experiences they interact with and we have introduced additional parental controls that help parents and caregivers manage their child's experience on our Platform, users from time to time, notwithstanding our efforts, have been able to evade our systems, and have been exposed to content that may not be age-appropriate.

In addition to limiting content to age-appropriate audiences and blocking other inappropriate content, we have statutory obligations under U.S. federal law to block or remove child pornography and report apparent offenses to the National Center for Missing and Exploited Children. While we have dedicated technology and trained human moderator staff that can detect and remove sexual content involving children, there have been instances where such content has been uploaded, and any unforeseen future non-compliance by us or allegations of non-compliance by us with respect to U.S. federal laws on child pornography or the sexual exploitation of children could significantly harm our reputation, create criminal liability, and could be costly and time consuming to address or defend. We may also be subject to additional criminal

> liability related to child pornography or child sexual exploitation under other domestic and international laws and regulations.
>
> Further, we have faced and are currently defending allegations that our Platform has been used by criminal offenders to identify and communicate with children and to possibly entice them to interact off-Platform, outside of the restrictions of our moderated chat, content blockers, and other on-Platform safety measures. While we devote considerable resources to prevent this from occurring, we are unable to prevent all such interactions from taking place. We have also received and expect to continue to receive a high degree of media coverage alleging the use of our Platform for illicit or objectionable ends. For example, we have experienced negative media publicity from traditional media sources and self-described short seller investors, related to the age of some of our developers, the content that developers produce, our operating metrics and disclosures, the strength of our moderation practices, and the conduct of users on our Platform that may be deemed illicit, explicit, profane, or otherwise objectionable. Additional unfavorable publicity has covered, and may in the future cover, our privacy, cybersecurity or data protection practices, terms of service, including our advertising policies, product changes, product quality, litigation or regulatory activity, our use of and policies regarding generative AI, the actions of our users, and the actions of our developers or creators whose products are integrated with our Platform.

94. Roblox's 2025 Annual Report on Form 10-K was similarly vague and materially false and misleading. That 10-K was signed by defendants D. Baszucki; M. Guthrie; A. [illegible]; G. Baszucki; C. Carvalho; J. Kilar; A. Lee G. Mastantuono & A. Wong.

95. As a result of these lawsuits and significant governmental and public pressure, Roblox announced it would be integrating enhanced age verification software into its platform globally beginning in January 2026. Specifically, during its third quarter 2025 earnings call on October 30, 2025, Roblox announced that, as part of its goal to "establish[] Roblox as the gold standard for communication safety on the internet," it "plan[ned] to require facial estimation for all users

accessing communication functions"—an age check technology that would use AI to verify users' age based on video or photo selfies—and that it would now also "limit communication between adults and minors who do not know each other in real life."

96. Both Chopra and Baszucki were publicly adamant that these changes would not have any meaningful effect on the growth trajectory of the Company. On the fourth quarter earnings call for fiscal year 2025 on February 5, 2026, the Company touted that it was still "expecting bookings growth of 22% to 26%" for 2026, which was supposedly "informed by recent content trends that we've seen in early 2026." Baszucki further claimed that the Company had not noticed any change in user behavior or engagement levels as a result of the new age verification system.

97. Roblox was forced to reveal the true impact of its enhanced safety features less than three months later, during its April 30, 2026 earnings call for the first quarter of fiscal year 2026, when it shocked investors by announcing that it would be dramatically slashing its bookings guidance by $1 billion. The Company explained that the global implementation of its new age verification software would significantly reduce its daily active users for the foreseeable future.

98. Specifically, the Company announced that, following the global rollout of its age verification system, growth in daily active users had already declined by half —to 35%, "from the roughly 70% growth rates we saw in the past 2 quarters,"—and acknowledged that "[u]ser acquisition and engagement was also impacted." As a result, Roblox "significantly" lowered its 2026 bookings guidance from 22-26% to 8-12%, or from a range of $8.8 billion to $8.55 billion announced just 90 days prior to a range of $7.33 billion to $7.6 billion.

99. Baszucki further revealed that, as a result of the new age verification technology, there was a significant "reduction in the percent of users communicating on our platform," as Roblox "no longer allow[ed] adults to communicate with users under 16." Moreover, users who had not yet conducted or who refused to conduct the age check—which Baszucki revealed amounted to nearly half of Roblox's total daily active users, with only 51% having completed it—could not use the platform's chat functions at all. This had resulted in dramatically lower engagement on the platform, as Roblox's chat function was a big draw for users, and had further caused lower app store ratings, which Baszucki stated had "contribut[ed] to a reduction in organic sign-ups that typically flow from

app stores."

100. Analysts were stunned, and questioned management's credibility. For example, during the April 30, 2026 earnings call, one analyst remarked that he was "puzzled" because only "90 days ago," the Company had issued bookings guidance of 20 to 26%, and now "the guid[ance] is meaningfully cut for the full year." Piper Sandler also issued a report downgrading Roblox shares and remarking that "[t]he magnitude of the FY26 bookings guidance cut (just ~85 days after issuing it) reflects a level of uncertainty in the business", concluding that "[a] few quarters will likely be needed . . . to rebuild credibility with investors."

101. JP Morgan analysts likewise noted that "most investors expected a modest cut to the outlook" due to implementation of the age check system, "but nothing close to this magnitude." Likewise, UBS analysts issued a report titled "Resetting numbers for age verification and safety investment" and stated that they "expect moderating growth amid platform changes/difficult comps." In reaction to these disclosures, Roblox share price dropped 18%, from $55.26 per share to $45.13 per share, wiping out approximately $6 billion in market value.

102. In April 2026, Nevada Attorney General Aaron Ford announced a landmark $12 million child-safety agreement with Roblox, which included $10 million payable to support non-digital youth programs.

103. This confidential investigation leading to the 12 million child-safety agreement with Roblox and the Nevada Attorney General commenced on November 1, 2024.[3]

104. In a "Letter Agreement," Roblox also agreed to pay $3,000,000 to Nevada outside counsel, Claggett and Sykes.

105. Roblox's officers and directors knew or should have known of the use of Roblox's platform by predators via published reports such as:

- Ed Dickson, Inside The Underground Strip Club Scam on Kid Friendly Gaming Site Roblox, Rothy Store September 21, 2021

---

[3]See *State of Nevada v. Roblox Corporation*, Case No.: A-26-944136-B, Dept. No.: XXXI CONSENT JUDGMENT, Exhibit A, Page 1) (https://ag.nv.gov/uploadedFiles/agnvgov/Content/News/PR/PR_Docs/2026/2026%200415%20Roblox%20-%20CJ.pdf

- Hindenburg Research: Roblox Inflated Key Metrics for Wall Street And a Pedophile for Hellscope Kids Hindenburg Research October 8, 2024. Roblox's Pedophile Problem, Bloomberg Business Week July 23, 2024, Carville and D'Anastasio.

106. Roblox is also being investigated by Florida's Office of Statewide Prosecution, *In Re: Statewide Prosecutor Criminal Investigation* OSP No. 2025-osp-0692 First Judicial Circuit Court, Leon County Florida and has been sued in *State of Texas v. Roblox Corporation*, District Court Kings County Texas, November 6, 2025; *Commonwealth of Kentucky v. Roblox, Inc.*, Madison Ct. Cir. Ct. 25-CI-00868, October 6, 2025.

107. The Controller, Defendant D. Baszucki, Roblox's President, CEO and director owned 58.8% of Roblox voting equity. Under Nevada law, he is liable to Roblox if he exerted undue influence on any officers and directors with the purpose and proximate effect of inducing a breach of fiduciary duty by any director or officers. His sale of Roblox stock as described herein, appear under the circumstances known to date to constitute unexculpated transactions from which the Controller earned an improper non-ratable personal benefit which resulted in material and non-speculative detriment to shareholders generally.

108. In addition to misrepresenting its business strategy as children's-safety-first/most-robust-safeguards-in-the industry, Rolox also failed and refused to purge duplicate accounts from its user/subscriber count. Indeed, Roblox's internally discussed strategy was to lower barriers to increase the metrics that would drive Roblox stock price higher and/or maintain its price from deflating.

109. Since October 1, 2024 through April 2026, a multitude of insiders have sold unusual amounts of Roblox stock at suspicious times, not including tax related selling. Those insiders include G. Baszucki, D. Baszuchi, M. Guthrie, A. Lee, A. Rawlings, M. Bronstein, M. Reinstra, A. Chakravathy, C. Carvalho, M. Kaufman, A. Wong, N. Chopra. These sales occurred often outside of 10b5-1 plans.

110. Roblox's Code of Business Conduct and Ethics mandate to directors and officers to protect (and not exploit) Roblox's confidential information.

111. As to the directors and officers stock sales, it is almost universally recognized under corporate law principals that stock sales on the open market do not constitute execution of board powers or official governance. It is further universally recognized that the protection of the basis judgment rule applies only to "official conduct," which does not include stock sales of company stock. *See generally Guzman v. Johnson*, (Nev. Sup. Ct.), holding that NRS 78.138 is the sole avenue of liability against directors "for corporate decisions." Accordingly, said insider sales are actionable under Section 10b of the Securities Exchange Act and the Nevada Securities Act NRS 90.570. The Insider Trading Defendants can be liable to Roblox under NRS 90.660 and the *Brophy* Insider Trading Defendants can be liable to Roblox under Delaware law.

112. The directors and officers named herein are not protected by Nev. Rev. Stat. 78.138(7) because under 78.138(7)(a)(b)(2) the acts and omissions described herein ". . . involve intentional misconduct, fraud or a knowing violation of law." *Id. See also State Comm'r of Ins. v. Chur*, 2025 Nev. Lexis 77 (holding that violation of "regulations" satisfy the statute's requirements of "knowing violation of law"). Consequently, such claims if proved are neither exculpated nor indemnifiable by Roblox. In the event, the inculpated directors and officers are personally liable to Roblox.

113. Nevada recently amended it business code effective May 30, 2025 (AB No 239) to, *inter alia*, extend the business judgment protection only where directors and officers act on "an informed basis."

114. On February 1, 2025, Roblox filed it's 10-K annual report for fiscal year 2024, which stated the following:

> Our highest priority is to create a safe and civil online environment for our users. Because our Platform includes children aged 5 and over, our safety and civility policies are purpose-built to be strict. We have a multi-layered moderation system that is designed to assess all content uploaded to Roblox for potential safety and civility issues. Our safety and civility policies, which include our Community Standards, define acceptable content and communication, and coupled with user behavior, inform a wide range of AI algorithms that automatically moderate content.

Those algorithms are backed up by a team of thousands of moderators focused on improving quality and handling the most difficult decisions. On top of that, we have robust user reporting that provide additional coverage. We have no tolerance on our Platform for content or behavior that violates our Community Standards. We work closely with regulators, authorities, and safety groups in many countries. We endeavor to promptly report any suspected child exploitation or abuse materials to the relevant authorities. Our Platform is designed to comply with the Children's Online Privacy Protection Act ("COPPA"), and we regularly monitor and evaluate compliance with other U.S. federal and state and foreign laws and regulations regarding privacy and data protection, including the General Data Protection Regulation ("GDPR"). We partner with leading global organizations focused on child and internet safety, including the WeProtect Global Alliance, Digital Wellness Lab, Family Online Safety Institute, UK Safer Internet Centre, Internet Matters, the Internet Watch Foundation, and kidSAFE, among others. We are also a member of various organizations, such as the Association for United Kingdom Interactive Entertainment and the Technology Coalition, with a goal of cross-industry collaboration, knowledge and technology exchange in areas of user safety, and child safety. As a member of the Technology Coalition and a founding member of its cross-platform signal sharing Lantern program, we are committed to providing transparency and promoting child safety online. We also nominate the board chair position of the Family Online Safety Institute where we educate and provide balanced perspectives to policy makers to help draft thoughtful online safety legislation. We continue to work diligently with other digital platforms to report bad actors and inappropriate content so that they can also take appropriate actions on their platforms…We use AI and a dedicated team of human moderators to review content, including images, audio, and video, uploaded into our Platform. Our scanning algorithms also review and monitor communications that flow through Roblox to proactively block and protect users from inappropriate behavior, such as questions about personal

> information and instructions on how to connect on less protective third-party chat applications. The algorithms in our chat filters are age-sensitive: they monitor both what users can say and see based on their ages. (Emphasis added).

115. The statements above were false and misleading when made because Defendants knew its safety policies were not built to be strict, that Roblox was not adequately monitoring the plethora of dangerous content being uploaded to its platform and that Roblox was not promptly reporting suspected child exploitation to the relevant authorities. Rather, Defendants knew that the platform lacked basic safeguards for children and that the Company's growth was fueled by the exploitation of children and the illicit use of its platform.

116. Roblox filed its annual proxy statement on May 29, 2025, and stated the following:

> Perhaps our biggest ambition for 2025—though by no means a new one for us—is to lead the world in safety for online gaming. We want people to continue to feel safe on our platform. Last year we launched more than 40 safety features and policies including extensive updates to our parental controls making it easier for parents to be part of their children's digital lives. We also limited chat options for Roblox users under age 13 and added age-gates to certain content. This year, we are planning to continue expanding those controls while also building out further support for parents and making our communications features safer than ever[.] (Emphasis added).

117. The statement above regarding Roblox's historical safety efforts and its ambition for 2025 "to lead the world in safety for online gaming" was false and misleading when made because Defendants had not been prioritizing safety and had in fact been benefitting from the exploitation of children on its platform. This statement was also false because Defendants omitted that Roblox's executives had known for years that Roblox lacked basic safety features for children and that the Company's growth was fueled by the exploitation of children on its platform, and that Roblox had prioritized its growth over investment in child safety infrastructure.

118. The truth regarding Roblox's lack of child safety controls first began to emerge on October 30, 2025, when Roblox first announced that it would be implementing new age verification technology after a flurry of litigation and investigations had been initiated against the Company. In

reaction to this disclosure, Roblox stock price dropped 16%, from $133.74 per share to $113 per share, wiping out over $13 billion in market value.

119. However, the Company continued to downplay the effect that its safety enhancements would have on Roblox's financial results. Indeed, despite knowing that implementing those safety measures would have a dramatic impact on its bottom line due to users' illicit use of the platform, the Company did not alert investors to any expected material financial impact. Instead, Roblox raised its 2025 guidance, indicating that it expected its strong results to continue unabated, with the Company now expecting nearly 40% bookings growth for the full year.

120. Then on January 30, 2026, Roblox disclosed it was being investigated by the EU after a Dutch watchdog opened a probe into whether the Company and its platform adequately protected minors. Specifically, the Netherlands Authority for Consumers and Markets launched an official review of the Company's protections for minors and was examining whether Roblox was taking adequate steps to keep child users safe across the European Union.

121. In reaction to this news, Roblox stock price dropped another 13%, from $75.73 per share to $65.76 per share, wiping out approximately $6 billion in market value.

122. The full truth regarding Roblox's growth being fueled by the illicit use of its platform and its lack of meaningful safety features was fully revealed on April 30, 2026, when Roblox reported its financial results for the first quarter of fiscal 2026.

123. Specifically, Roblox disclosed it would be dramatically slashing its bookings guidance by $1 billion due to its new age verification software, which would significantly reduce its daily active users for the foreseeable future. The Company announced that growth in its daily active users had already declined by half since the age check rollout, to 35% "from the roughly 70% growth rates we saw in the past 2 quarters," while "[u]ser acquisition and engagement was also impacted."

124. Baszucki also revealed that 51% of Roblox's daily active users had not yet conducted the age check—which amounted to nearly half of Roblox's total daily active users—and thus could not use the platform's chat functions at all. This had resulted in dramatically lower engagement on the platform, as Roblox's chat function was a big draw for users, and had further caused lower app

store ratings, which Baszucki stated had "contribut[ed] to a reduction in organic sign-ups that typically flow from app stores."

125. As a result, Roblox "significantly" lowered its 2026 bookings guidance from 22-26% to 8-12%, or from a range of $8.8 billion to $8.55 billion announced just 90 days prior to a range of $7.33 billion to $7.6 billion. Baszucki further revealed that, because of the new age verification technology, there was a significant "reduction in the percent of users communicating on our platform," as Roblox "no longer allow[ed] adults to communicate with users under 16."

**COUNT I**

**Against Roblox for Violations of Section 14(a) Of The Exchange Act and Rule 14(a)-9 Promulgated Thereunder for False and Misleading Statements in Proxy Materials in Connection with the 2025 Vote to Reincorporate in Nevada**

126. Plaintiff incorporates by reference and realleges each and every allegation contained set forth above, as though fully set forth herein.

127. Section 14(a)of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 781 of this title." 15 U.S.C. § 78n(a)(1).

128. SEC Rule 14a-9 prohibits the solicitation of shareholder votes in proxy communications that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240. 14a-9.

129. SEC Rule 14a-9(b), 17 C.F.R. § 240.14(a) states: "the fact that a proxy statement has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete."

130. Roblox issued the 2025 Proxy Materials with the intention of soliciting shareholder support for the resolution for reincorporation.

131. Defendant D. Baszucki included a letter which "asked for [shareholders] support for all our management proposals, including: "a proposal to approve the reincorporation of Roblox from a Delaware corporation to a Nevada corporation. We believe that Nevada's corporate law framework and statutory regime aligns with Roblox's culture of innovation, values and mission to connect the world with civility and optimism. It also allows us to continue to build shareholder value, by providing a supportive, predictable environment. The proposal to reincorporate to a Nevada corporation was recommended following a rigorous and thoughtful analysis by our Nominating and Corporate Governance Committee and our Board of Directors."

132. The Proxy included a "Board Vote Recommendation" "For" Proposal 4 "Reincorporation."

133. At the time the votes were solicited defendants D. Baszucki owned 1.3% of the Class A common shares which are publicly traded and owned 100% of the non-publicly traded Class B shares. This gave him a total voting power of 60%. Each B share is entitled to 20 votes, while each A share is entitled to one vote.

134. Roblox decreed that all shares would vote "as a single class on all matters for which your vote is being solicited."

135. Defendants Carvalho, Kilar, G. Mastantuono, D. Baszucki; G. Baszucki; Lee and Wong were the directors who recommended that shareholders vote in favor of the reincorporation.

136. Although, the Proxy including appendices containing Roblox's Delaware and Nevada articles of incorporation & bylaws, the Proxy failed to make any disclosure of the self-interest of each director in recommending the reincorporation proposal.

137. The Proxy did not disclose any of the investigations or legal actions against Roblox for its safety failures.

138. The Individual Defendants knew or recklessly disregarded that the Proxy was materially false and misleading in regard to the above-referenced material information.

139. The Proxy Statements were defective and in violation of SEC Rule 14 and Rule 14a-9

because they contained untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading as more fully set forth herein.

140. The misrepresentations and omissions in the Proxy Materials were material to Plaintiff, who was solicited to vote in favor of the reincorporation proposal.

141. The defects in the proxy statements would have been considered material and important by a reasonable shareholder who was in the process of deciding how to vote to allow Roblox to reincorporate from Delaware to Nevada and would have been viewed by a reasonable investor as having significantly altered the total mix of information made available.

142. The proxy solicitation reincorporation was an essential link in the reincorporation.

143. A majority of votes of outstanding stock was required to approve the reincorporation.

144. The materiality of the negligent misrepresentations and omissions in the 2025 Proxy proposal for the vote to reincorporate from Delaware to Nevada arises out of the fact that by reincorporating from Delaware to Nevada, the defendant directors secured for themselves protections from personal fiduciary liability to Roblox under Delaware law. Nevada corporate law provides far greater protection to directors from fiduciary breach claims than Delaware. In addition, Delaware has strong well developed jurisprudence imposing liability on insider trading defendants which exposed defendants to liability for post-reincorporation trading.

145. The 2025 Proxy Statement's failure to accurately, truthfully and completely disclose Roblox's safety standards processes and safeguards and the failure to disclose the potential regulatory actions and the failure to accurately describe the differences between Nevada law and Delaware law regarding defendants' fiduciary obligations rendered the Proxy Statement materially misleading.

146. Demand on the Board with respect to this claim is futile for the additional reason that all director were beneficiaries of the reincorporation and realized not ratable benefits from other shareholders.

147. The value of Plaintiff's stock and Plaintiff's corporate franchise rights were injured and damaged by Defendants' actions.

148. As a direct and proximate result of issuing the defective Proxy Materials, negligent

acts and omissions detailed herein, Plaintiff has suffered damages in connection with the approval of the reincorporation proposal.

**COUNT II**

**Against Controlling Defendants for Violations Of Section 20(a) Of The Exchange Act**

149. Plaintiff incorporates by reference and realleges each and every allegation contained set forth above, as though fully set forth herein.

150. The Controlling Defendant is a controlling person of Roblox within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his positions and due to his participation in and/or control of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Materials filed with the SEC for solicitation of votes for reincorporation, had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the Proxy Materials that Plaintiff contends were materially incomplete and misleading.

151. The Controlling Defendant was provided with or had unlimited access to copies of the Proxy Materials and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

152. In particular, the Controlling Defendant had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.

153. By virtue of the foregoing, Controlling Defendant violated Section 20(a).

**COUNT III**

**Against the Individual Defendants for Breach of Fiduciary Duty**

154. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

155. The Individual Defendants owed and owe Roblox fiduciary obligations. By reason of

their fiduciary relationships, the Individual Defendants owed and owe Roblox the highest obligation of loyalty and care.

156. The Individual Defendants and each of them, violated and breached their fiduciary duties.

157. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Roblox has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

158. Plaintiff, on behalf of Roblox, has no adequate remedy at law.

**COUNT IV**

**Against the Individual Defendants for Unjust Enrichment**

159. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

160. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Roblox. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Roblox.

161. Further, the Insider Selling Defendants sold Roblox stock while in possession of material, nonpublic information that artificially inflated the price of Roblox stock. As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

162. Plaintiff, as a stockholder and representative of Roblox, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

163. Plaintiff on behalf of Roblox, has no adequate remedy at law

**COUNT V**

**Against the *Brophy* Insider Trading Defendants for Unjust Enrichment or Under *Brophy***

164. Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

165. Roblox officially completed its reincorporation from Delaware to Nevada on May 30, 2025, following stockholder approval.

166. Prior to reincorporating to Nevada on May 30, 2025, Roblox was a Delaware incorporation. While a Delaware incorporation before May 30, 2025, and subject to Delaware law and common law, several insiders sold Roblox stock while in possession of material nonpublic information subjecting themselves to a *Brophy* claim.

167. While a Delaware corporation and in possession of material nonpublic information, D. Baszucki sold 4,533,843 shares for proceeds of approximately $308,705,113 as reflected in the chart below.

| Filing Date | Trade Date | Ticker | Insider Name | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|---|---|
| 5/22/2025 17:52 | 5/20/2025 | RBLX | Baszucki David | $80.66 | -10,424 | 1,747,734 | -1% | ($840,777) |
| 5/16/2025 16:09 | 5/13/2025 | RBLX | Baszucki David | $75.18 | -786,873 | 736,457 | -52% | ($59,157,307) |
| 5/14/2025 20:11 | 5/12/2025 | RBLX | Baszucki David | $74.44 | -163,125 | 839,991 | -16% | ($12,142,650) |
| 5/7/2025 19:36 | 5/5/2025 | RBLX | Baszucki David | $72.19 | -1,899,997 | 1,449,058 | -57% | ($137,161,289) |
| 4/9/2025 20:24 | 4/7/2025 | RBLX | Baszucki David | $52.48 | -314,098 | 1,048,953 | -23% | ($16,483,949) |
| 3/19/2025 17:28 | 3/17/2025 | RBLX | Baszucki David | $57.05 | -40,918 | 1,151,425 | -3% | ($2,334,225) |
| 3/5/2025 18:01 | 3/3/2025 | RBLX | Baszucki David | $64.94 | -248,568 | 1,051,420 | -19% | ($16,142,428) |
| 2/27/2025 21:39 | 2/25/2025 | RBLX | Baszucki David | $60.50 | -1,738 | 1,066,781 | 0% | ($105,149) |
| 2/21/2025 20:40 | 2/20/2025 | RBLX | Baszucki David | $61.33 | -6,448 | 2,764,288 | 0% | ($395,478) |
| 2/3/2025 17:00 | 1/30/2025 | RBLX | Baszucki David | $71.64 | -330,194 | 225,835 | -59% | ($23,656,355) |
| 12/9/2024 17:35 | 12/5/2024 | RBLX | Baszucki David | $57.31 | -483,335 | 1,004,280 | -32% | ($27,698,899) |
| 11/22/2024 18:18 | 11/20/2024 | RBLX | Baszucki David | $51.43 | -6,460 | 3,077,511 | 0% | ($332,249) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 11/20/2024 18:50 | 11/18/2024 | RBLX | Baszucki David | $50.71 | -241,665 | 1,052,407 | -19% | ($12,254,358) |

168. While a Delaware corporation in possession of material nonpublic information, G. Baszucki sold 1,363,650 shares for proceeds of approximately $91,739,130 as reflected in the chart below.

| Filing Date | Trade Date | Ticker | Insider Name | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|---|---|
| 5/7/2025 19:41 | 5/5/2025 | RBLX | Baszucki Gregory | $72.11 | -973,875 | 12,107,799 | -7% | ($70,228,092) |
| 4/3/2025 19:28 | 4/1/2025 | RBLX | Baszucki Gregory | $60.45 | -97,387 | 12,399,961 | -1% | ($5,886,745) |
| 3/11/2025 19:10 | 3/10/2025 | RBLX | Baszucki Gregory | $53.55 | -97,388 | 12,429,177 | -1% | ($5,215,397) |
| 1/24/2025 17:26 | 1/22/2025 | RBLX | Baszucki Gregory | $65.89 | -26,000 | 12,460,226 | 0% | ($1,713,015) |
| 12/30/2024 16:37 | 12/26/2024 | RBLX | Baszucki Gregory | $59.70 | -26,000 | 12,486,226 | 0% | ($1,552,184) |
| 12/2/2024 19:07 | 11/27/2024 | RBLX | Baszucki Gregory | $49.75 | -26,000 | 12,512,226 | 0% | ($1,293,627) |
| 11/4/2024 18:07 | 10/31/2024 | RBLX | Baszucki Gregory | $50.00 | -117,000 | 12,604,824 | -1% | ($5,850,070) |

169. While a Delaware corporation and in possession of material nonpublic information, Lee sold 640,950 shares for proceeds of approximately $39,029,093 as reflected in the chart below.

| Filing Date | Trade Date | Insider Name | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|---|
| 5/22/2025 18:01 | 5/21/2025 | Lee Anthony P | $82.45 | -14,000 | 1,275,191 | -1% | ($1,154,355) |
| 5/16/2025 19:51 | 5/14/2025 | Lee Anthony P | $79.45 | -13,600 | 1,276,171 | -1% | ($1,080,572) |
| 5/13/2025 20:15 | 5/12/2025 | Lee Anthony P | $74.99 | -26,000 | 1,277,123 | -2% | ($1,949,679) |
| 5/8/2025 20:03 | 5/6/2025 | Lee Anthony P | $70.01 | -66,150 | 408,592 | -14% | ($4,630,964) |
| 4/3/2025 17:16 | 4/1/2025 | Lee Anthony P | $61.37 | -21,200 | 13,082,325 | 0% | ($1,300,963) |
| 1/17/2025 16:21 | 1/16/2025 | Lee Anthony P | $65.04 | -250,000 | 11,402,683 | -2% | ($16,259,275) |
| 12/3/2024 19:48 | 12/2/2024 | Lee Anthony P | $51.19 | -25,000 | 26,929,608 | 0% | ($1,279,670) |
| 11/18/2024 19:21 | 11/15/2024 | Lee Anthony P | $52.34 | -25,000 | 26,954,608 | 0% | ($1,308,435) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 11/1/2024 17:29 | 10/31/2024 | Lee Anthony P | $50.33 | -200,000 | 39,526,582 | -1% | ($10,065,180) |

170. While a Delaware corporation and in possession of material nonpublic information, Guthrie sold 483,593 shares for proceeds of approximately $28,929,151 as reflected in the chart below.

| Filing Date | Trade Date | Ticker | Insider Name | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|---|---|
| 5/22/2025 17:50 | 5/20/2025 | RBLX | Guthrie Michael | $80.66 | -24,168 | 553,688 | -4% | ($1,949,319) |
| 5/14/2025 20:12 | 5/12/2025 | RBLX | Guthrie Michael | $71.77 | -50,000 | 577,856 | -8% | ($3,588,622) |
| 4/7/2025 16:37 | 4/3/2025 | RBLX | Guthrie Michael | $58.79 | -50,000 | 577,856 | -8% | ($2,939,632) |
| 3/6/2025 17:17 | 3/4/2025 | RBLX | Guthrie Michael | $60.14 | -50,000 | 456,887 | -10% | ($3,006,854) |
| 2/26/2025 21:25 | 2/24/2025 | RBLX | Guthrie Michael | $61.14 | -50,000 | 456,887 | -10% | ($3,057,039) |
| 2/24/2025 18:05 | 2/20/2025 | RBLX | Guthrie Michael | $61.34 | -21,614 | 456,887 | -5% | ($1,325,844) |
| 2/12/2025 21:39 | 2/11/2025 | RBLX | Guthrie Michael | $65.94 | -26,154 | 478,501 | -5% | ($1,724,673) |
| 12/9/2024 17:33 | 12/5/2024 | RBLX | Guthrie Michael | $55.92 | -100,000 | 392,609 | -20% | ($5,591,778) |
| 12/4/2024 16:48 | 12/2/2024 | RBLX | Guthrie Michael | $51.36 | -40,000 | 392,609 | -9% | ($2,054,400) |
| 11/22/2024 18:23 | 11/20/2024 | RBLX | Guthrie Michael | $51.43 | -21,657 | 392,609 | -5% | ($1,113,855) |
| 11/19/2024 20:43 | 11/15/2024 | RBLX | Guthrie Michael | $52.07 | -40,000 | 414,266 | -9% | ($2,082,780) |
| 11/4/2024 18:06 | 10/31/2024 | RBLX | Guthrie Michael | $49.44 | -10,000 | 414,266 | -2% | ($494,355) |

171. While a Delaware corporation and in possession of material nonpublic information, Carvalho sold 38,956 shares for proceeds of approximately $2,547,414.

| Filing Date | Trade Date | Ticker | Insider Name | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|---|---|
| 5/7/2025 19:42 | 5/5/2025 | RBLX | Carvalho Christopher | $72.16 | -12,985 | 1,143,380 | -1% | ($936,981) |
| 4/3/2025 19:22 | 4/1/2025 | RBLX | Carvalho Christopher | $60.45 | -12,985 | 1,143,380 | -1% | ($784,920) |
| 3/5/2025 | 3/3/2025 | RBLX | Carvalho Christopher | $63.57 | -12,986 | 1,143,380 | -1% | ($825,513) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 18:22 | | | | | | | | |

172. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the *Brophy* Insider Selling Defendants were unjustly enriched at the expense of, and to the detriment of, Roblox.

173. The *Brophy* Insider Trading Defendants had access to non-public information concerning Roblox and were motivated to sell Roblox stock by the MNPI.

174. The *Brophy* Insider Trading Defendants are fiduciaries of Roblox, possessed MNPI of Roblox, and used that information improperly in selling Roblox stock because they were motivated, in whole or in part, by the substance of that MNPI of Roblox, and acted with scienter.

175. The *Brophy* Insider Trading Defendants exploited their positions at, and ownership of Roblox and profited from their misconduct and their exploitation of material and adverse inside information.

176. The other Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Roblox that was tied to the performance or artificially inflated valuation of Roblox, or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

177. Plaintiff, as a stockholder of Roblox, seeks disgorgement of all profits and all profits on profits, including from insider transactions, benefits, and other compensation, obtained by the *Brophy* Insider Trading Defendants due to their wrongful conduct and breach of their fiduciary duties.

178. Plaintiff, on behalf of Roblox, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff KEN BECKER, on behalf of Roblox, respectfully requests that the Court enter judgment:

A. Declaring that Plaintiff may maintain this action on behalf of Roblox, and that Plaintiff is an adequate representative of the Company;

B. Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Roblox;

C. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breach of fiduciary duty and unjust enrichment;

D. Directing Roblox to take all necessary actions to reform and improve its corporate govern nee and internal procedures to comply with applicable laws and to protect Roblox and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a provision to control insider selling and;
2. a provision to require the disclosure of when10b5-1 trading plans are entered into or amended;
3. a proposal to strengthen Roblox oversight of its disclosure procedures;
4. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and
5. a provision to permit the stockholders of Roblox to nominate at least three candidates for election to the Board

E. Extraordinary equitable and/or injunctive relief as perm1\ed by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Roblox has an effective remedy;

F. Awarding to Roblox restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

G. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H. Granting such other and further relief as the Court deems just and proper.

Dated: November 18, 2026

**THE DIULIO FIRM PC**

/s/ Kristopher P. Diulio____________
Kristopher P. Diulio

Attorneys for Plaintiff
KEN BECKER

**PLAINTIFF'S DEMAND FOR A JURY TRIAL**

Plaintiff KEN BECKER demands a trial by jury on all causes of action triable to a jury.

Dated: November 18, 2026

**THE DIULIO FIRM PC**

/s/ Kristopher P. Diulio____________
Kristopher P. Diulio

Attorneys for Plaintiff
KEN BECKER

**VERIFICATION OF KEN BECKER**

I, KEN BECKER, am a plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 11/18/2026

/s/ Ken Becker

KEN BECKER